# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00063-SCT

*MADRA K. LYAS, INDIVIDUALLY AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES FOR CHRISTOPHER LOUIS LYAS, DECEASED*

*v.*

*FORREST GENERAL HOSPITAL AND PINE GROVE BEHAVIORAL HEALTH CENTER*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/03/2014 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| TRIAL COURT ATTORNEYS: | JONATHAN MICHAEL FARRIS |
| | S. CHRISTOPHER FARRIS |
| | J. ROBERT RAMSAY |
| | ROBERT D. GHOLSON |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JONATHAN MICHAEL FARRIS |
| | S. CHRISTOPHER FARRIS |
| ATTORNEYS FOR APPELLEES: | J. ROBERT RAMSAY |
| | ROBERT D. GHOLSON |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 10/29/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., KITCHENS AND CHANDLER, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1. In January 2003, Christopher Lyas ("Christopher") died while receiving treatment at

Pine Grove Behavioral Health Center ("Pine Grove"), a subsidiary of Forrest General

Hospital. Shortly after Christopher's death, his widow, Madra Lyas ("Madra") was visited by an employee of the Forrest County Coroner's Office who provided her a provisional Certificate of Death which listed the immediate cause of death as "pending" and a provisional autopsy report which listed the cause and manner of Christopher's death as "pending toxicology," but contained pathological diagnoses of "Hypertensive Heart Disease" and "Morbid Obesity." The employee informed Madra that Christopher probably had died of a heart attack. Seven years later, after meeting in person with the Forrest County Coroner, Madra was given Christopher's final Certificate of Death, which professed "[c]hanges consistent with meprobamate and carisoprodol overdose" as the immediate cause of Christopher's death. She then filed suit against Pine Grove and Forrest General Hospital in the Circuit Court of Forrest County, alleging that Pine Grove had caused Christopher's death negligently by means of a prescription drug overdose. The trial court granted summary judgment in favor of Forrest General and Pine Grove, holding that Madra had not filed suit within the one-year statute of limitations prescribed by the Mississippi Tort Claims Act. Madra appeals, arguing that the discovery rule tolled the applicable statute of limitations. Because Madra has produced evidence of her reasonable diligence during the statutory period, a genuine issue of material fact exists on the issue of whether the statute of limitations was tolled. We therefore reverse the circuit court's grant of summary judgment in favor of Forrest General and remand this case for a trial on the merits.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

¶2.    On Thursday, January 23, 2003, thirty-two-year-old Christopher Lyas checked into Pine Grove, an inpatient, mental-health-focused subsidiary of Forrest General Hospital, in Hattiesburg, Mississippi.  Christopher weighed more than 400 pounds and had a history of mental health disorders, including manic depression and schizophrenia. When Christopher checked into Pine Grove, he was seeking adjustments to his medications.

¶3.    The next day, January 24, 2003, a Pine Grove nurse telephoned Christopher's pharmacist to get a list of all of the medications and dosages Christopher was taking.  When the nurse wrote the prescription dosages for the drug Soma, a muscle relaxant, the handwriting was illegible.  Based on the nurse's illegible writing, medication orders were drafted whereby Christopher was given 700 milligrams of Soma four times per day.  Thus, Christopher's medication orders indicated that he should receive 2,800 milligrams of Soma daily; but the maximum daily recommended dosage of Soma is 1,400 milligrams a day. Because of this clerical error, Christopher had been ordered double the maximum recommended dosage of Soma while in Pine Grove's care. In accordance with Pine Grove's medication orders, Pine Grove staff gave Soma to Christopher at the following intervals:

| | | | |
|---|---|---|---|
| January 24th | 12 p.m. | — | 700 mg |
| | 5:00 p.m. | — | 700 mg |
| | 10:00 p.m. | — | 700 mg |
| January 25th | 5:30 a.m. | — | 700 mg |

3

¶4.     At 8:30 a.m. on January 25, 2003, an unidentified physician entered Christopher's room and observed him sleeping. The physician stayed for approximately forty-five minutes. Another unidentified physician entered Christopher's room at 11:30 a.m. and stayed for forty-five minutes.

¶5.     At 1:05 p.m., Pine Grove staff found Christopher in his room unresponsive, drooling, and snoring. In response, the staff gave him Narcan, a drug designed to counteract drug overdoses.[1] Although a physician ordered a dose of Narcan at 1:45 p.m, this drug is not listed on any of Pine Grove's medication administration reports.

¶6.     After the Narcan proved ineffective, the staff began performing CPR. An ambulance arrived and transported Christopher to the Forrest General Hospital Emergency Room. Upon his arrival, the emergency room physician diagnosed Christopher with "cardiopulmonary arrest." Christopher was pronounced dead in the emergency room at 1:55 p.m.

¶7.     That day, Charles Killingsworth, a deputy coroner for Forrest County, called Madra Lyas, Christopher Lyas's wife, and informed her that Christopher had died. Later that afternoon, Killingsworth met with Madra in her home and informed her that he thought Christopher had died of a heart attack.

¶8.     On January 26, 2003, Dr. Steven Hayne performed an autopsy on Christopher's corpse. Dr. Hayne issued a provisional autopsy report, listing the cause and manner of death as "[p]ending toxicology." In the provisional autopsy report, Dr. Hayne gave Christopher the pathological diagnoses of "Hypertensive Heart Disease" and "Morbid Obesity." Based

---

[1] This fact was discovered by the plaintiff during the course of litigation in this case.

on the results of the provisional autopsy report, Killingsworth signed a provisional Certificate of Death on January 28, 2003. The provisional Certificate of Death listed the immediate cause of death as "pending." After Madra called Killingsworth requesting information about her husband's death, he delivered both the provisional autopsy report and the provisional Certificate of Death to Madra at her workplace.

¶9.     After he had received the results of the toxicology testing, Dr. Hayne amended the autopsy report to list the cause of death as "[c]hanges consistent with meprobamate and carisoprodol overdose." He changed his pathological diagnoses from "Hypertensive Heart Disease" and "Morbid Obesity," to "Hypertensive Heart Disease," "Morbid Obesity," and "Shizaffecta disease - depression." Almost two years after Christopher's death, on November 12, 2004, Killingsworth signed and filed the final Certificate of Death. In the final Certificate of Death, Killingsworth listed Christopher's cause of death as "[c]hanges consistent with meprobamate and carisoprodol overdose."

¶10.    Although copies of the final death certificate and final autopsy report were delivered to Forrest General and Pine Grove, none was sent to Madra. Moreover, Madra was not notified that these completed documents existed.

¶11.    Madra had contacted several people in an effort to obtain Christopher's death certificate. First, Madra testified during a deposition that she had tried to call Killingsworth at the Forrest County Coroner's Office. She said that when she called the coroner's office, the phone rang but nobody answered. She also testified that she had contacted Wayne McNichols, the director of the funeral home that handled the arrangements for Christopher.

5

Madra said she asked McNichols whether he had a final death certificate. He told her that he did not. During their conversation, he did not tell her how to obtain a death certificate. Nearly two years after Christopher's death, she contacted Chief Wayne Landers at the Forrest County Sheriff's Department. He told her that there was no final death certificate and that the cause of Christopher's death was still "pending."

¶12. In August 2010, Madra happened to see Butch Benedict, the Forrest County Coroner, eating lunch at her work place. Madra gave Benedict a note asking whether he could help her get a copy of Christopher's death certificate. On August 25, 2010, Benedict faxed Madra a copy of Christopher's death certificate. On September 24, 2010, Madra filled out a Department of Health form to obtain a certified copy of the death certificate. Thereafter, Madra retained counsel.

¶13. Madra's attorneys sent a Notice of Claim, in accordance with the requirements of the Mississippi Tort Claims Act, to Forrest General Hospital and Pine Grove (hereinafter collectively referred to as "Forrest General") on March 20, 2011. On August 25, 2011, Madra filed a lawsuit in Forrest County Circuit Court, alleging that Forrest General wrongfully had caused Christopher's death by giving him almost twice the daily recommended dosage of Soma. Forrest General filed a Motion to Dismiss on September 29, 2011, arguing that Madra had failed to meet the one-year statute of limitations for bringing her claims. On July 6, 2012, Forrest General filed a Motion to Dismiss or in the Alternative for Summary Judgment.

¶14. On November 9, 2012, the Forrest County Circuit Court denied the motion to dismiss. At the same time, the trial court took the motion for summary judgment under advisement pending the completion of discovery. On October 25, 2013, Forrest General filed a Revised Motion for Summary Judgment, arguing that Madra had failed to comply with the one-year statute of limitations. Forrest General also argued that the dosage of Soma administered to Christopher did not exceed the daily recommended dosage and could not have been fatal. Finally, Forrest General took umbrage with the fact that Dr. Hayne had attributed Christopher's death to Soma overdose when he did not know the quantity of drugs in Christopher's body.

¶15. On December 23, 2013, the trial court granted summary judgment in favor of Forrest General solely based on Madra's failure to meet the applicable statute of limitations. The trial court held that issues of fact remained regarding Forrest General's liability.

¶16. Madra filed a timely appeal with this Court, arguing that the trial court had erred by granting summary judgment in favor of Forrest General because an issue of fact remains about when the statute of limitations in this case started to run.

¶17. Thus, on appeal, we must consider one issue:

> **Whether a genuine issue of material fact remains regarding whether the statute of limitations was tolled in this case.**

### DISCUSSION

¶18. When reviewing an appeal of a trial court's grant of summary judgment, this Court applies "a *de novo* standard of review." ***Moss v. Batesville Casket Co.***, 935 So. 2d 393, 398

7

(Miss. 2006). Furthermore, "the application of a statute of limitations is a question of law," which the Court reviews *de novo*. ***Sarris v. Smith***, 782 So. 2d 721, 723 (Miss. 2001).

¶19. The trial court "shall" grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c).

¶20. It is undisputed that Forrest General Hospital and Pine Grove are "community hospitals" under Section 41-13-10(c) of the Mississippi Code.[2] As such, according to the Mississippi Tort Claims Act, "[a]ll actions . . . shall be commenced within one (1) year next after the date of the tortious, wrongful or otherwise actionable conduct on which the liability phase of the action is based, and not after . . . ." Miss. Code Ann. § 11-46-11(3)(a) (Rev. 2012).

¶21. The Mississippi Tort Claims Act's (MTCA) one-year statute of limitations for medical malpractice cases is subject to the discovery rule. ***Wayne Gen. Hosp. v. Hayes***, 868 So. 2d 997, 1000 (Miss. 2004). The discovery rule tolls the statute of limitations "until a plaintiff 'should have reasonably known of some negligent conduct, even if the plaintiff does not

---

[2]　　(c) "Community hospital" shall mean any hospital, nursing home and/or related health facilities or programs, including without limitation, ambulatory surgical facilities, intermediate care facilities, after-hours clinics, home health agencies and rehabilitation facilities, established and acquired by boards of trustees or by one or more owners which is governed, operated and maintained by a board of trustees.

Miss. Code Ann. § 41-13-10(c) (Rev. 2013).

8

know with absolute certainty that the conduct was legally negligent.'" ***Moore ex rel. Moore v. Mem'l Hosp. of Gulfport***, 825 So. 2d 658, 667 (Miss. 2002) (quoting ***Sarris v. Smith***, 782 So. 2d 721, 725 (Miss. 2001)). "[T]o benefit from the discovery rule, a plaintiff must be reasonably diligent in investigating her injuries." ***Wright v. Quesnel***, 876 So. 2d 362, 366 (Miss. 2004). This Court has recognized that "[t]he focus is on the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that he probably has an actionable injury." ***Hayes***, 868 So. 2d at 1001 (quoting ***Smith v. Sanders***, 485 So. 2d 1051, 1052 (Miss. 1986)).

¶22.   This Court has explained the discovery rule as follows:

> There may be rare cases where the patient is aware of his injury prior to the [expiration of the limitations period], but does not discover and could not have discovered with reasonable diligence the act or omission which caused the injury. In such cases, the action does not accrue until the latter discovery is made.

***Sanders***, 485 So. 2d at 1052-53.

¶23.   Madra argues that the statute of limitations in this case was tolled until August 25, 2010, when she learned of Forrest General's and Pine Grove's negligence through the Final Autopsy Report and Certificate of Death.

¶24.   Forrest General argues that the discovery rule does not apply to the case *sub judice*. According to Forrest General, the injury in the case was not latent, because it was discoverable on January 25, 2004, the day Christopher died. It also argues that Madra was on notice that she needed to do further investigation into the cause of death because it was listed as "pending" on the provisional Certificate of Death.

9

¶25.     The closest Mississippi case resembling the facts under consideration here is *Caves v. Yarbrough*, 991 So. 2d. 142 (Miss. 2008), in which this Court applied the discovery rule to a medical malpractice wrongful death claim governed by the Mississippi Tort Claims Act.

¶26.     In *Caves*, fifty-one-year-old Jimmy Caves was admitted to the hospital on April 15, 2000, for abdominal pain. *Id.* at 144. On April 17, 2000, Jimmy died after his heart stopped, and he could not be resuscitated. *Id.* The day after Jimmy died, his wife, Irene Caves, agreed to an autopsy. *Id.* at 145.  The following day, the coroner said that the cause of death was a "septic colon" *Id.*

¶27.     On April 21, 2000, Irene requested and obtained the medical records pertaining to her husband's death.  *Id.* According to her testimony, when she attempted to obtain a copy of the autopsy report from the pathologist's office, Irene was told there would be a delay due to the death of the doctor who had performed the autopsy.  *Id.* She continued to request the report until September 2000, when she moved out of state and turned the pursuit of the autopsy report over to her son, Kevin, who continued to request the report.  *Id.* Although the autopsy report was completed on September 28, 2000, Irene said that she did not receive it until March of 2001. *Id.*

¶28.     Before she received the autopsy report, Irene had contacted an attorney, because she suspected wrongdoing by the hospital and by Jimmy's treating physician, Dr. Yarbrough. *Id.* Based on the information available at the time (which did not include the autopsy report), the attorney declined to take Irene's case. *Id.* She then contacted another attorney, who consulted

an emergency-room physician who testified that Jimmy's death was "caused by or contributed to by care far below the minimal standard." *Id.*

¶29.   On February 13, 2002, eighteen months after Jimmy's death, Irene provided the hospital with a notice of a claim under the MTCA. *Id.* On April 12, 2002, Irene followed up the notice with a lawsuit against the hospital and Dr. Yarbrough. *Id.*

¶30.   The Court determined that neither the hospital nor Dr. Yarbrough was entitled to summary judgment on the basis of the statute of limitations. *Id.* at 155.  The Court held that "the MTCA's one-year statute of limitations begins to run when the claimant knows, or by exercise of reasonable diligence should know, *of both the damage or injury*, and the act or omission which proximately caused it." *Id.* (emphasis added). The Court emphasized that "the finder of fact (in this case, the trial judge) must decide when those requirements are satisfied." *Id.*

¶31.   This case plainly falls within the discovery rule, when compared to the facts of *Caves*. Like *Caves*, Madra made numerous inquiries regarding the final death certificate.  Unlike *Caves*, the preliminary autopsy results and the emergency room diagnosis, "cardiopulmonary arrest," did not indicate that there was a potential cause of action.

¶32.   Here, both parties agree that the final Certificate of Death put Madra on notice of possible claims against Forrest General for Christopher's death.  Thus, the relevant inquiry in this case is when Madra, using reasonable diligence, should have discovered the final death certificate.  A reasonable fact finder could find that Madra acted with reasonable diligence under the circumstances.  Madra avers that "[f]rom February of 2003 to August 24,

11

2010[,] [she] continued to believe Christopher died of a heart attack. And there was absolutely no reason for her to believe, suspect or investigate otherwise." Indeed, she received information from Deputy Coroner Killingsworth expressing his belief that the cause of death was a heart attack. Moreover, given that Christopher was grossly overweight, it was objectively reasonable for Madra to believe that Christopher had died of a heart attack even at such a relatively young age.

¶33. Furthermore, Madra introduced evidence attesting to her diligence in pursuit of this information. Madra testified that she had contacted several people in order to obtain Christopher's death certificate. First, Madra testified that she had tried to call Killingsworth at the Forrest County Coroner's Office. She said that when she called the coroner's office, the phone rang but nobody answered the phone. She also testified that she had contacted Wayne McNichols, the director of the funeral home that handled the arrangements for Christopher. Nearly two years after Christopher's death, she contacted Chief Wayne Landers at the Forrest County Sheriff's Department. He told her that there was no final death certificate and that the cause of Christopher's death was still "pending."

¶34. Moreover, an inordinately long period of time elapsed between Christopher's death and the issuance of the final death certificate. A reasonable fact finder could find that the delay in issuing the final death certificate was unreasonable.

¶35. Ultimately, there was a two-year gap between Christopher's death and the issuance of the final death certificate. Furthermore, Madra called the coroner's office, funeral home, and sheriff's department to try to get a final copy. Moreover, given the circumstances of

Christopher's death, the fact finder reasonably could find that Madra had no reason to believe that she had a negligence cause of action to pursue until she received the completed death certificate. Given that Madra has produced substantial evidence of her diligence, a question of fact remains with respect to whether Madra exercised reasonable diligence under the circumstances.

¶36. Forrest General argues that this case is similar to *Hayes*, 868 So. 2d at 1000. In *Hayes*, Wa'Landra Mesha Hayes was admitted to Wayne General Hospital on September 22, 1997, for twenty-four-hour observation for pneumonia. *Id.* at 999. During the course of her stay at the hospital, she suffered from respiratory distress, facial edema, liver enlargement, and renal failure. *Id.* Consequently, she was transferred to the University of Mississippi Medical Center (UMMC). *Id.* While at UMMC, a doctor misplaced a peritoneal dialysis catheter and perforated Wa'Landra's bowel. *Id.* This resulted in a serious infection in Wa'Landra's bloodstream, and she died several days later on October 13, 1997. *Id.*

¶37. Wa'Landra's death certificate listed "cardiomyopathy, congestive heart failure, and sepsis" as the causes of death. *Id.*

¶38. In the fall of 1999, Wa'Landra's mother had a chance meeting with one of the nurses who had treated Wa'Landra at Wayne General Hospital. *Id.* The nurse told Wa'Landra's mother that she had witnessed the hospital engaging in negligent care. *Id.* Thus, on December 21, 1999, two years and two months after Wa'Landra's death, Wa'Landra's mother sued Wayne General Hospital and UMMC, claiming wrongful death and medical malpractice. *Id.*

¶39. Because UMMC was a "community hospital" for purposes of the Mississippi Tort Claims Act, the same one-year statute of limitations applied in that case. *Id.* at 1001, 1005. Wa'Landra's mother argued that she did not know of UMMC's negligence until her chance encounter with the nurse. *Id.* at 1001. UMMC argued that the negligence should have been discovered contemporaneously with Wa'Landra's death, if not before. *Id.*

¶40. This Court held that "the discovery rule did not operate to toll the statute of limitations." *Id.* The Court averred that "the plaintiffs, *at that time of Wa'Landra's death, had enough information such that they knew or reasonably should have known that some negligent conduct had occurred*, even if they did not know with certainty that the conduct was negligent as a matter of law." *Id.* (emphasis added). The Court said that "[s]ince the death certificate included sepsis as one of the causes of death, it should have been apparent to the plaintiffs that some negligent conduct had occurred." *Id.* But Wa'Landra's decedents had not done any investigation into her death after receiving the death certificate. *Id.* Ultimately, the Court concluded that the "the plaintiffs were not reasonably diligent in investigating the cause of Wa'Landra's injuries." *Id.*

¶41. We find that this case is easily distinguishable from *Hayes*. First, before Wa'Landra's death, Wa'Landra's decedents knew that UMMC had perforated her bowel and that she was septic. Here, there was substantial evidence available at the time of Christopher's death that he had died of a heart attack. Second, Wa'Landra's certificate of death indicated that she had died as a result of medical malpractice. Christopher's provisional death certificate indicated that he had died of a heart attack.

14

**CONCLUSION**

¶42.    In sum, an issue of fact remains regarding whether Madra engaged in the "reasonable diligence" necessary to toll the statute of limitations in this case under the discovery rule. We therefore reverse the grant of summary judgment and remand the case to the Forrest County Circuit Court for a trial on the merits.

¶43.    **REVERSED AND REMANDED.**

   **WALLER, C.J., DICKINSON, P.J., LAMAR, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.   RANDOLPH, P.J., NOT PARTICIPATING.**